UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

DRORA KEMP,

                    Plaintiff,               04 Civ. 9926 (RWS)

    -against-                         OPINION

METRO-NORTH RAILROAD,

                    Defendant.

------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        RESNICK NIRENBERG & SIEGLER
        101 Eisenhower Parkway, Suite 300
        Roseland, NJ 07068
        By:  Gerald Jay Resnick, Esq.
             Steven Siegler, Esq.

        Attorneys for Defendant

        BROWN RAYSMAN MILLSTEIN FELDER & STEINER, LLP
        900 Third Avenue
        New York, NY 10022
        By:  Eric D. Witkin, Esq.

**Sweet, D.J.**

        Defendant Metro-North Railroad ("Metro-North" or the
"Defendant") has moved pursuant to Rule 56, F. R. Civ. P., for
summary judgment dismissing the complaint of plaintiff Drora Kemp

("Kemp" or the "Plaintiff").  For the reasons set forth below, the motion is granted.

## Prior Proceedings

Kemp filed her complaint on December 16, 2004 (the "Complaint"), and it contained twelve counts:

Count One alleged harassment based on disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"); Count Two, demotion/termination in violation of the ADA; Count Three, retaliation in violation of the ADA; Count Four, age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"); Count Five, harassment based on disability or perceived disability in violation of the New York State Human Rights Law, Executive Law, Article 15 § 290, et seq. ("NYSHRL"); Count Six, demotion/termination on the basis of disability or perceived disability in violation of the NYSHRL; Count Seven, retaliation in violation of the NYSHRL; Count Eight, age discrimination in violation of the NYSHRL; Count Nine, harassment on the basis of disability or perceived disability in violation of the New York City Human Rights Law, Administrative Code § 8-107(1)(a) ("NYCHRL"); Count Ten, demotion/termination on the basis of

2

disability or perceived disability in violation of the NYCHRL;
Count Eleven, retaliation in violation of the NYCHRL; and Count
Twelve, age discrimination in violation of the NYCHRL.  Kemp has
voluntarily withdrawn Counts One, Two, Four, Six, Eight, Ten, and
Twelve and her claim for punitive damages has also be withdrawn.
What remains at issue are Counts Three, Five, Seven, Nine and
Eleven: claims of harassment based on disability under NYSHRL and
NYCHRL and retaliation under ADA, NYSHRL and NYCHRL.

Discovery has proceeded and the instant motion was argued
and marked fully submitted on January 10, 2007.

**The Facts**

The facts are set forth in the Defendant's Statement of
Undisputed Material Facts, the Plaintiff's Material Facts in
Dispute and the Defendant's Reply to Plaintiff's Response.  The
facts are not disputed except as noted below.

Kemp is a New Jersey resident formerly employed by Metro-
North.  She is a college graduate and possesses a Masters degree in
Library Science.  Prior to joining Metro-North, she worked as a
librarian for the law firm of Sullivan and Cromwell and as a
librarian and records manager for the Metropolitan Transit

3

Authority ("MTA") for five years.

Metro-North is a public benefit subsidiary corporation of the MTA, which is a New York State public benefit corporation created by the New York State legislature to provide transportation for commuters in the New York City metropolitan area.  Each public benefit subsidiary corporation of the MTA, including Metro-North, is a "body politic and corporate and [has] all those powers vested in the [MTA] shall determine to include in its certificate of incorporation."  N.Y. Pub. Auth. Law § 1266 (5).

At all times relevant to the period covered by the Complaint, Metro-North maintained and published to its employees a policy prohibiting discrimination based on age and disability and prohibiting retaliation for complaining about discrimination.  The policy encouraged employees to report discriminatory treatment or offensive behavior.

Metro-North's General Counsel, Richard Bernard ("Bernard"), hired Kemp in February 1993 as the Legal Department's Manager of Administration and Legal Support Services.

Kemp initially reported to Metro-North's Deputy General Counsel.  In or about the mid-1990s, she began reporting directly

4

to Bernard.  Kemp had worked with Bernard at the MTA for one year prior to her joining Metro-North.

The Metro-North Position Description for the Manager of Administration and Legal Support Services position outlines the following "Major Accountabilities" and percentages of time on each:

- Prepare and monitor departmental budget – 10%

- Create and supervise maintenance of litigation, contract, memorandum, correspondence files for department, including summarization of each document and establishment of cross references for computer-assisted information and retrieval systems – 40%

- Maintain law library – 10%

- Manage all personnel-related activities – 10%

- Supervise clerical, paralegal and other support services for professional staff – 15%

- Execute wide variety of administrative functions, including implementation of Company's policies, procedures and internal controls – 15%

(Siegler Certification, Ex. K).

Kemp worked in the Legal Department, which was located at 347 Madison Avenue.  She had a windowed, lawyer-sized office.  The

5

salary for her position began at $52,000 per year and was gradually increased to $70,000 annually by 2004.

Kemp supervised a filing clerk who was a union employee and undertook research projects for the lawyers in the department when requested. At one point in time she assisted one of Metro-North's lawyers in the trial of a Federal Employers' Liability Act ("FELA") claim. In addition, from time to time she would assist the lawyers in working with various software programs the Legal Department had in place.

In the late 1990s Kemp sought, unsuccessfully, other employment both within Metro-North and with other Metropolitan Transportation Authority ("MTA") agencies. In 1997 Kemp was absent as a result of a hysterectomy and in 1999, she was absent after an automobile accident.

From the late 1990s through 2002, Bernard looked for other jobs for Kemp, both inside and outside of Metro-North, personally and through Celia Ussak ("Ussak"), Metro-North's Director of Human Resources, and Shirley Joshua ("Joshua"), who succeeded Ussak in the spring of 2002. In an attempt to increase her salary and responsibilities, Kemp proposed an upgrade of her title. While Bernard supported this effort, the Human Resources

6

Department ("HR") rejected it.

In July 2001, Bernard noted on her performance appraisal:

> Ms. Kemp performs her job duties with a great
> deal of skill. I believe, however, that she
> does not feel adequately challenged by those
> duties.   She has explored, with my support,
> assignments outside the Law Dept which can
> make better use of her skills.   We will
> continue to explore the availability of those
> opportunities.

(Siegler Certification, Ex. L).

Kemp has conceded that her position in the Legal
Department did not fully utilize her skills.  Before 2002, Bernard
considered abolishing her position and distributing her
responsibilities to the secretaries.

Before 2002, there had been friction between Kemp,
attorneys Sue Barnett ("Barnett") and Lisa Hart ("Hart"), and
members of the support staff.  In addition, employees in other
departments informed Joshua that Kemp was argumentative and
condescending, that she was difficult to work with and that they
did not want her in their departments.

Before 2002, Barnett told Bernard that Kemp was

7

unproductive, that Kemp frequently came in late and left early and did not adequately manage the files. According to Barnett, Kemp failed to compile on time the "brief bank" Bernard had requested, had a dispute with Barnett on the issue of Internet access for secretaries, and did not accept the authority of anyone other than Bernard.

Beginning in 2000, Barnett and Joshua began to consider revising Kemp's job description. Barnett complained to Bernard that Kemp was accessing their personal documents. Kemp had responsibility for archiving documents and had access to network documents.

Kemp was diagnosed as having breast cancer in June of 2002. She underwent a lumpectomy in July 2002 and radiation therapy, which began in August and was completed by mid-October.

Kemp's Job Performance Appraisals reflect that at all times prior to her diagnosis of breast cancer, Kemp performed her job duties in a manner which met Metro-North's expectations.

After obtaining clearances from her doctor and Metro-North's medical department, she returned to work on a three-day per week basis on October 21, 2002 and then full time as of December

8

16, 2002.  When she worked part-time, she was still paid as though she were working full time.  According to Kemp, Bernard insisted that Kemp come to work the same three days every week.  Kemp explained that she had a number of doctor's appointments which made her schedule difficult to predict weeks in advance.  Kemp designated Monday, Wednesday and Friday as her workdays and told Bernard that sometimes she would have to take other days off when she had a doctor's appointment.

When Kemp returned to work full time, against the advice of her doctors, she was able to perform all of her job duties. Kemp was fatigued due to her cancer treatment and testified that she was also suffering with worry, depression and difficulty sleeping.  Kemp spoke about her diagnosis with Barnett, who also had been treated for breast cancer, and who was "absolutely" sympathetic in a conversation, sometime prior to October 2002. (Kemp Tr. 94).

In December 2002, Kemp complained to the payroll department, to Bernard's assistant, and then to Bernard that she was missing four days' pay.  Bernard asked Joshua to investigate, and she in turn involved Payroll Director Gary Blaner ("Blaner"). On January 10, 2003, Kemp emailed the President of Metro-North, accusing unnamed persons of "maliciously" or "recklessly" deducting

9

four days from her pay in December 2002.  (Kemp Tr. 147).  Bernard
responded to Kemp's email by stating that the matter was being
investigated and that no one had maliciously or recklessly done
anything to her.  The Vice President for Human Resources and
Workforce Diversity, Gregory Bradley ("Bradley"), investigated
Kemp's complaint, met with her, Joshua and Blaner on January 15,
2003 and determined she was owed additional pay, which she received
subsequently.

In the early part of 2003, Bernard expressed anger at
Kemp regarding a party that she had planned for a retiring
attorney; he was upset with the amount of money that the party
would cost and that Kemp and her colleague had overestimated the
headcount.

In January 2003, Bernard became acting General Counsel of
the MTA while continuing to serve as Metro-North General Counsel.
On January 30, 2003, he formally delegated to Barnett all
administrative supervision of the Legal Department, including the
functions for which Kemp was responsible.

On January 30, 2003, Kemp requested a two-week vacation,
for which she had already purchased airline tickets.  Both Bernard
and Barnett told Kemp a two-week vacation was inappropriate in

10

light of the large backlog of filing.  Barnett wrote to the Legal
Department staff on February 3, 2003 that they should submit
vacation requests before making firm vacation plans.  Barnett told
Kemp she would approve only two days of the eight requested unless
Kemp brought in the airline tickets.

Kemp had never been denied vacation or asked to bring in
plane tickets in the past.  To her knowledge, the requirement to
produce plane tickets was not imposed on any other employee.  Kemp
canceled the vacation.

On February 3, 2003, Barnett's temporary secretary Roz
Gillespie ("Gillespie"), requested intranet/internet access to do
research for Barnett.  Barnett asked Kemp to arrange the access.
One week later, Gillespie and Kemp had a verbal altercation.  After
Kemp protested, Barnett responded on February 12 with a two-page
memo about the incident, copying Bernard.  On February 6, 2003,
Kemp supplied Barnett with a status report on her workload, which
revealed a filing backlog dating back to July 2002 and including
nine boxes of unfiled files of Hart, who had left the department in
November of 2001.  Barnett then wrote Kemp that she should have
filed Hart's files when Hart left.

On February 21, 2003, Kemp met with Maryanne Gormley-

11

O'Connor ("Gormley-O'Connor") from the Workforce Diversity
Department to complain about Barnett's treatment and tone, citing
the vacation request and memo about Internet access, and according
to Kemp reported that it appeared that Barnett was trying to fire
her because of her recent diagnosis with, treatment of, and medical
leave for breast cancer. During the conversation, Gormley-O'Connor
explained the distinction between formal complaints and informal
complaints. Kemp submitted an oral, informal complaint at that
time.

In mid-February, 2003, Kemp was advised by several of her
coworkers that Barnett had been soliciting them to say negative
things about her work habits and personality. Barnett asked Kemp's
co-workers whether she was "really and truly helpful" and whether
she was ever nasty or negative.

On February 24, 2003, Kemp heard from Joshua that she and
Barnett were revising Kemp's job description. Kemp then filed a
formal internal complaint against Barnett with Workforce Diversity
because she feared the new job description, which she had not seen,
would have an adverse impact on her position.

The internal complaint alleged that Barnett harassed Kemp
"on a continuous basis" after becoming Kemp's supervisor. It

12

referred to "an especially nasty memorandum" from Barnett on
February 12, 2003 and "two more hand written missives, this time
with an explicit threat included." It asserted Kemp's belief "that
Ms. Barnett's aim is to give me a negative performance review,
after 10 years of above-average reviews, and, ultimately, to fire
me, because of my illness and/or because of my [January 10, 2003]
email to [Metro-North President] Mr. Cannito [about her missing
pay]." In her deposition, Kemp stated that the harassment alleged
in her internal complaint consisted solely of Barnett's writings
described above and did not allege verbal harassment by Barnett and
that she had no further facts to suggest that there was any
connection between her breast cancer in 2002 and the conduct of
Barnett in February 2003.   She testified that her basis for
alleging that Barnett's conduct was based on her illness was that
"all the problems after she had become my supervisor and all of
this kind of supervision which I encountered from her happened
after my illness.   Immediately following it".   (Kemp Tr. 238).


    Workforce Diversity hired the law firm of Seyfarth Shaw
("SS") to investigate Kemp's internal complaint and informed Kemp,
who did not object.

    On June 3, 2003, SS attorney Gloria Galant ("Galant"), a

13

first-year associate, interviewed Kemp, Barnett and Bernard.   Kemp
told Galant that Barnett's conduct to which Kemp objected stopped
after Kemp's February 24, 2003 internal complaint but that she
could not "foresee productive relations with" Barnett.   (Galant
Aff. Ex. 1, at D-2634).

Kemp told Galant that she was amenable to placement
outside the Legal Department on the condition that the new job was
not punishment, was in her field and fit her knowledge, experience
and education.

On June 18, 2003, SS sent its report and recommendations
to Kay Turner, Director of Workforce Diversity ("Turner").   The
report found no discrimination, but instead found an irreparable
personality conflict between Kemp and Barnett, and recommended (1)
transferring Kemp, (2) ending Barnett's supervision of Kemp, and
(3) training for Barnett.   The SS report recommended that Kemp be
moved to a position "of comparable status" which "provide[s]
comparable opportunities and compensation" as her current one and
that if Kemp was not willing to move to an open position, then she
should no longer report to Barnett and that if removing Barnett as
Kemp's supervisor was not possible, then Barnett should receive
training "to assist her in addressing performance issues and
interacting with subordinate employees."   (Siegler Certification,

14

Ex. NN, at 10.)   The report also recommended that Barnett receive "assistance with regard to the tone she utilizes when interacting with her co-workers, especially those who may have sensitive issues, such as Kemp."   (Siegler Certification, Ex. NN, at 10.) When she later read the redacted report Kemp did not take issue with any of its factual determinations or findings.   In July 2003, Workforce Diversity began looking for another position for Kemp.

During the latter part of 2003, Kemp took two medical leaves totaling nine weeks in connection with surgery on her foot and knee: from August 18, 2003 to September 29, 2003 and then again from October 9, 2003 through November 3, 2003.

On October 3, 2003, between Kemp's two medical leaves, Gormley-O'Connor told Kemp about the results of the investigation. At their meeting, Gormley-O'Connor told Kemp that Barnett was no longer her supervisor as of that day, that Metro-North would be looking to put her in a different position, that the entire Legal Department would receive training, that Kemp's job description would be updated to reflect her expanded job responsibilities, and that Bernard would contact her regarding the update.   Gormley-O'Connor stated that Metro-North regretted the unfortunate events which occurred.   Kemp stated that she did not want the new job to be punishment for her complaining, and Gormley-O'Connor assured her

15

that would not be the case.

Barnett was provided a copy of the SS report by Bernard and given an opportunity to correct any inaccuracies. Barnett wrote a several page rebuttal, which was edited by Bernard. Barnett then requested that her rebuttal be included in the investigation record, which it was. Kemp was initially not given a copy of the SS report.

Kemp complimented Gormley-O'Connor's "professional and compassionate handling" of her internal complaint as well as her "scrupulously" kept notes and responsiveness. (Kemp Tr. 277-278, 410-412, 524).

On November 5, 2003, Gormley-O'Connor asked Kemp for her updated resume to aid in finding her another job. Kemp complied on November 18.

Kemp by a November 17 email to Gormley-O'Connor indicated that she "was not wanted in the Legal Department." On December 17, 2003, Gormley-O'Connor replied that

> the independent investigation . . . concluded
> that the likelihood of a productive future
> working relationship between you and Ms.
> Barnett was remote. Thus, alternate placement

16

> within the MTA family is the preferable
> course. This issue was discussed during our
> October 3, 2003 meeting my office and you
> agreed that your working relationship with Ms.
> Barnett was not repairable. We also discussed
> and you expressed interest in doing something
> different outside the Legal Department that
> would utilize your skills. Therefore your
> updated resume that Workforce Diversity
> received on November 18, 2003 was promptly
> forwarded in our efforts to comply with the
> recommendation of the independent
> investigation and your wishes.

(Witkin Aff., Ex. 30). Kemp conceded that Gormley-O'Connor's email

accurately summarized events. (Kemp Tr. 432-33).

Kemp emailed Bernard on November 18, 2003, stating that

"I do hope that HR finds me some placement which I will find

challenging, would utilize my education and skills and which would

be suitable on a personal level." (Witkin Aff., Ex. 30). Bernard

responded on November 19 that if she also wished to look at her

Legal Department job description "please tell me in what respects

you wish to modify it". (Witkin Aff., Ex. 30).

On November 27, 2003, Bernard responded to Kemp's

November 10 email about her October 3, 2003 meeting with Gormley-

O'Connor. Bernard's response stated: "alternate placement within

the MTA family is the preferable course. You should pursue that.

HR is working on potential placement". (Witkin Aff., Ex. 8, at

17

58).

Kemp took off Thanksgiving week, November 24-28, returning to work on December 1. The entire Legal Department received a one-day conflict resolution training session on December 2, 2003, which fulfilled the SS report's recommendation that Barnett receive such training, though she was not singled out.

The day after the training session, Kemp commenced eight weeks of medical leave from December 3, 2003 through January 28, 2004. She testified that the December 2, 2003 training session caused her to take the eight weeks' leave.

On December 18, 2003, Bernard announced by email that Ana Aviles ("Aviles") would temporarily replace Kemp during her medical leave. Kemp objected to what she perceived as the sarcastic tone of the email but did not dispute its accuracy. (Kemp Tr. 439-48). That same day, Kemp emailed Gormley-O'Connor, blaming her situation on her complaint one year earlier about missing pay.

On January 14, 2004, David Bownas ("Bownas") of the HR department wrote to Kemp and informed her that she had utilized her allotment of 160 days of Short Term Disability as of January 12 and was on unpaid Family Medical Leave Act ("FMLA") leave until January

18

28.

On January 17, 2004, while out on medical leave, Kemp emailed Bradley, accusing Bernard of insulting and untruthful emails and expressing apprehension about returning to work. On January 27, 2004, Bradley responded that Workforce Diversity was looking for another job for her.

On February 10, 2004, two weeks after returning from eight weeks of leave, Kemp filed an Equal Opportunity Commission Charge ("EEOC") against Metro-North (the "Charge"). The Charge repeated her complaints about her payroll problem and about Barnett's alleged harassment leading to the filing of the February 24, 2003 internal complaint. It also complained about the "delay of three and a half months" in telling her about the results of the SS investigation and conceded that, as the outside investigation had recommended, Barnett had been removed as her supervisor and a new job was being sought for her. She complained that Barnett had been allowed to see the investigator's report but she had not. She alleged no specific harassment but instead alleged an "anticipatory" retaliation claim based on her "fear that a new job may be a setup for failure" and her belief that "Metro-North is retaliating against me, is trying to constructively discharge me in violation of Title VII . . . and . . . the Americans with

19

Disabilities Act . . . ." (Witkin Aff., Ex. 8, at 97-102).

In her deposition, Kemp testified that Bernard harassed her as follows: he objected to her initial refusal to specify which three days she would work when she returned to work part time in October 2002; he failed to address her lost pay issue quickly enough; he appointed Barnett to supervise her and failed to stop Barnett from criticizing her; he refused to discuss the outside investigation of Kemp's internal complaint; he asked her if she saw confidential information on Barnett's computer screen when he found Kemp alone in Barnett's office; and he refused to do a performance evaluation on Kemp in April 2004 because she had been out so much and her transfer was pending. Bernard did not process the paperwork regarding Kemp's request for Short Term Disability in a timely manner, according to Kemp.

Turner, the Director of Workforce Diversity, was in charge of implementing the SS recommendation that Kemp be moved to a comparable position. In the Fall of 2003, Turner approached Sherry Herrington ("Herrington"), Chief Operations Officer, about employing Kemp in a position which would address the reasons why Metro-North was losing so many of its Step One grievances.[1]

---

[1] A "Step One" is a disciplinary hearing pursuant to Metro-North's collective bargaining agreement with its employees.

On February 23, 2004, Kemp met with Turner and Gormley-O'Connor about this new job in Operations Services, which would carry the title of Senior Research Specialist.   Herrington and Joshua prepared a job description for the position and shared it with Kemp.   At that time, Kemp advised them she had filed the Charge.   This was the first notice Metro-North received about the Charge.   The duties of the new position were as follows:

- Working with senior management in Crew Dispatching, research the types of absenteeism, analyze the results to find potential causes and recommend possible solutions to improve attendance.

- Working with managers responsible for discipline and Hearing Officers, research types and frequency of infractions, analyze the results and recommend several options to improve the consistency for the discipline process and possible alternatives.

- Working with local safety committees, research types of injuries, analyze results and potential causes and recommend possible strategies to avoid future injuries.

- Assist in any other Operation Services' initiatives as directed by Chief Operation Services Officer.

(Siegler Certification, Ex. BBB).


On February 24, 2004, Kemp initially told Gormley-O'Connor she was not interested in the Operations Services job.

However, later in that same conversation, Kemp reconsidered and
agreed to meet with Herrington, who also served as Metro-North's
Chief of Operations.  According to Kemp, she advised Gormley-
O'Connor, Turner and Bernard she did not want the Operations job.

Kemp, Turner and Gormley-O'Connor met with Herrington on
February 27, 2004.  During that meeting, Kemp further questioned
Herrington about the Senior Research Specialist job.  Herrington
told Kemp that if she took the position, she would be in a group
that reported directly to her (Herrington), and that she would have
the same salary and pay grade she had in the Legal Department.
They discussed the issues of computer software and forecasting.
The meeting ended with Herrington shaking Kemp's hand and saying
"welcome."  Herrington, Turner and Gormley-O'Connor left the
meeting with the impression that Kemp had all of her questions
answered, that the job would be a good fit for her and that she
would take it.

There is a factual dispute as to whether or not after the
February 27, 2004 meeting with Herrington, Kemp said anything to
Turner, Gormley-O'Connor or Herrington concerning the Operations
job.  Kemp has asserted that she rejected the job.

On March 1, 2004, Kemp told Gormley-O'Connor that she

22

would accept the new job in Operations with an Assistant Director title and a $10,000 salary increase. Kemp testified in her deposition that she was joking about the title and salary changes.

On or about May 31, 2004, Bernard called Kemp into his office and directed her to report to the Operations Department the next day. According to Kemp, she stated that she absolutely did not want that job. Bernard did not recall Kemp telling him this, although he recalled that Turner had relayed that Kemp had accepted the position.

On June 1, 2004, Kemp reported to her new position in the Crew Management Center, which is located in Grand Central Terminal. She testified that she was supposed to report to Herrington in Operations but reported instead to Robin Brown ("Brown"), a Manager who did not appear to know what Kemp's job was supposed to be, but who did show her the existing computerized databases for absences and how to access information in the system. She was assigned to a cubicle and called staff who were out sick, filed documents in their folders, made copies of documents and entered data from the telephone calls into a computer. She could not recall how much time she spent on each of those tasks, which she considered to be clerical.

23

Kemp testified that if the new job in Operations had been as it had been described to her, it would not have been a demotion.

Gormley-O'Connor thought there was striking similarity between the duties Kemp had performed in the Legal Department and the duties planned for her Senior Research Specialist position in Operations. The similarity included research and analysis and information technology work, including the development of databases.

Turner recalled that Herrington explained the new Operations job to Kemp in their February 27, 2004 meeting as follows:

> Sherry Herrington explained to [Kemp] that the job was going to be a new job in her department and that she wanted attention paid to the disciplinary component of the job in that Miss Kemp was coming from legal and had a legal background and, therefore, she was expecting that Miss Kemp would have the opportunity to review the arbitration decisions of the employees under her jurisdictions to give some understanding, some - she was losing a lot of her step ones and so she wanted somebody who could read the arbitration decisions and understand and see whether there were any similarities, what were they doing in these step ones, why were they losing, were there any similarities and requirements that the arbitrators would need, can we somehow put that in a database so that she could communicate that to the employees that are conducting the step ones and,

24

> therefore, raise her – the probability of
> being successful in those step ones. That was
> the disciplinary piece of the job.

(Turner Tr. 44-45).


Turner believed the move to Operations was a great opportunity for Kemp:

> I truly believed that this was an opportunity
> for a bad situation to work out for all. I
> truly believed that this would have been an
> opportunity give Miss Kemp a new start. Legal
> can carry on, we wouldn't have a tiny
> department with conflict, and we would have an
> opportunity for Mrs. Kemp to start over in a
> very significant position. There is certainly
> more growth in the [Operations] division than
> there is in any other division of the railroad
> . . . .

(Turner Tr. 91-92).


The Legal Department gave up Kemp's budget line to Operations.


According to Turner, Kemp never told her she did not want the Senior Research Specialist position. Turner believed that Kemp had accepted the position: she had seen Herrington welcome Kemp and the two of them shake hands; Kemp had given Turner the impression that "it was a fit, that she was satisfied with the position and

25

she was gonna take it," and Gormley-O'Connor had told Turner that Kemp would accept it. (Turner Tr. 104).   Turner told Bernard that Kemp had accepted it.

Neither Barnett nor Bernard participated in Workforce Diversity's decision to offer the Senior Research Specialist job to Kemp or to transfer her to Operations.  Turner made that decision.

Kemp left work on June 4 for a scheduled doctor's appointment and then left on vacation through June 14.

On June 4, 2004, Bernard informed the Legal Department that Aviles would perform many of Kemp's former duties in addition to Aviles' existing duties as a legal secretary, and that two other legal secretaries would also be performing some of Kemp's former duties.   Neither Turner, Gormley-O'Connor nor anyone else in Workforce Diversity participated in the decision concerning the reassignment of Kemp's former duties to others in the Legal Department.

On June 15, 2004, Kemp returned from vacation to her new job in Operations.  On the morning of June 16, 2004, Kemp emailed James DeMilt ("DeMilt"), her new supervisor in Operations, that she was not coming in because she had had a splitting headache "for a

26



few days" and had made an "emergency appointment" with her doctor. (Witkin Aff., Ex. 23). That afternoon, she emailed DeMilt that she had met with her doctor, who "advised me to take a long term leave from work," and she asked DeMilt to let her know "which forms I have to fill out and what my options are regarding a leave that will probably last a few weeks." (Witkin Aff., Ex. 8, at 118). Kemp did not indicate that the leave had anything to do with the new job or the transfer.

Kemp never complained to Herrington, Gormley-O'Connor, Turner, or anyone else in Operations or Workforce Diversity about the duties of the new job after she transferred. She testified that she did tell DeMilt that she could not do the job in a noisy cubicle. She also subsequently authorized her counsel to complain about the position.

On June 21, 2004, Kemp elected to have surgery on her foot. On July 20, 2004, Metro-North received Kemp's FMLA leave request form claiming that her "own serious health condition" rendered her "unable to perform the essential functions" of her position. (Witkin Aff., Ex. 47). That same day, July 20, 2004, unknown to Metro-North, Kemp had foot surgery, and her doctor directed she be not bear weight for six weeks.

27

On July 29, 2004, Kemp emailed DeMilt and Gormley-O'Connor, stating that she had been advised that she had exhausted her FMLA leave, asking DeMilt to "advise what my status is currently" and attaching her doctor's medical report dated June 23, 2004. (Witkin Aff., Ex. 8, at 120). Her psychiatrist's June 23, 2004 Medical Report stated that Kemp was "unable to attend her assigned work duties" and did not provide any date when she could return to work. (Witkin Aff., Ex. 8, at 119).

On July 30, 2004, Kemp emailed Turner and Gormley-O'Connor, stating that she had been "home sick for a few weeks" and further stating:

> My doctor and I feel that I am now capable to look for other job opportunities at Metro-North or at other MTA agencies. There are no positions that I can consider fit for me in the Web postings. Please let me know if there are any suitable jobs that you can offer.

(Witkin Aff., Ex. 8, at 121).

On August 10, 2004, Joshua responded to Kemp's July 30 email, stating:

> Your July 30th email makes no reference to the position as Senior Research Specialist ("SRS") in the Operations Services Department ("OSD"),

28

which you assumed on June 2, 2004.

On June 15, 2004, you commenced sick leave
from your SRS position right after taking
vacation from June 7-14.  While on that sick
leave you were advised that your Family and
Medical Leave Act leave entitlement would be
exhausted on July 14, 2004.   You have
exhausted your 2004 vacation and sick leave.
You are also aware that employees on sick
leave should contact their departments to make
the necessary arrangements for their return to
duty.  You have not done so.   Instead, you
sent your July 30th email to the Workforce
Diversity Department asking about jobs other
than the SRS position to which you transferred
on June 2, 2004.

If you do not contact me and arrange to comply
with Metro-North's return to duty procedures
before the close of business on August 12,
2004, we will treat your July 30th email as
confirmation that you have abandoned the SRS
position and resigned from Metro-North
Railroad effective July 30, 2004.

(Witkin Aff., Ex. 8, at 123).


On August 12, 2004, Kemp responded to Joshua's August 10,

2004 letter:


My sick leave has been ordered by my
psychiatrist, Dr. Adrian Zisu and I do not
have his permission to return to work yet . .
. . Please allow me to respond to your letter
formally within two weeks by August 26, 2004.
I cherish working for Metro-North and will
return to work as soon as I can.

(Witkin Aff., Ex. 8, at 124).

29

On August 13, 2004, Joshua replied to Kemp's August 12, 2004 email:

> We understand from your August 12, 2004 email that you are not now able to return to work at your Sr. Research Specialist (SRS) position. However, neither your email nor MD-1 form signed by Dr. Zisu states the date when you will be able to return to work. No later than August 18, 2004 I must be in receipt of a statement of the date on which you will be able to return to work at your SRS position. If at this point you are not able to determine when you will be able to return to work, please state that.

(Witkin Aff., Ex. 8, at 126).

Kemp signed and swore to an amendment to her EEOC charge (dated June 20, 2004) on August 2, 2006 and submitted it to the EEOC on August 5, 2006.  The amendment sought to add claims of age discrimination arising out of Kemp's June 2, 2004 transfer.  On August 12, 2004, the EEOC issued a Notice of Dismissal of Kemp's Charge, and a letter to Kemp stating that the EEOC had been "unable to conclude that the information [gathered from the EEOC investigation] establishes violations of the statutes" as claimed by Kemp.  (Witkin Aff., Ex. 8, at 134-36).

On or about August 17, 2004, Joshua received a letter from an attorney representing Kemp stating that:

30

> Ms. Kemp is unable to return to the position
> to which she was transferred in retaliation
> for her complaints, as she finds the transfer
> and the working conditions to be intolerable.
> Furthermore, her psychiatrist will not release
> her to return to that hostile work environment
> . . . .
>
> Ms. Kemp is more than willing and able to
> accept an appropriate transfer to the Legal
> Department of MTA and/or any of its agencies .
> . . .

(Witkin Aff., Ex. 49).

After Kemp's attorney's August 17, 2004 letter, Gormley-O'Connor checked whether there were any legal positions available in the MTA agencies, but found none.

On August 26, 2004, Joshua wrote to Kemp (copying her attorney), replying to her attorney's August 17, 2004 letter, stating in part as follows:

> You transferred to the SRS position effective
> June 2, 2004 without any reduction in your pay
> or benefits, but you reported to work in that
> position for only two or three days.  We do
> not see how the transfer or the working
> conditions could have been "intolerable" or
> the work environment "hostile" in a position
> you barely started.  Yet you state that you
> will not return to the SRS position.
>
> You also claim the transfer to the SRS
> position was "retaliation."  But you accepted
> that transfer and the Equal Employment
> Opportunity Commission has dismissed your
> "charge of discrimination" and retaliation.

31

> Because you are "more than willing and able"
> to accept another position, you do not appear
> to have a disability. You are thus "willing
> and able" to work. Accordingly, since your
> attorneys' August 17, 2004 letter confirms
> your refusal to return to your job, we treat
> that letter as confirming your resignation
> from Metro-North Railroad effective as of that
> date.

(Witkin Aff., Ex. 8, at 137).

Kemp stated in her deposition that Metro-North did not terminate her employment, but that she instead "left a job that I didn't want, that I did not take, that I didn't accept," and that she "abandoned" the Senior Research Specialist job to which she had transferred. (Kemp Tr. 651).

Herrington did not replace Kemp after Kemp refused to return to work in her Operations Services job. No one is performing the functions Herrington envisioned for that position.

Kemp's psychiatrist, Dr. Adrian Zisu ("Dr. Zisu") testified that he never released her to return to either the Legal or Operations jobs. Neither Kemp nor her doctor saw returning to the Legal Department as a viable option. Dr. Zisu stated: "By the time she was seeing me [November 25, 2003] she was very eager to be moved out of that [Legal] department." (Zisu Tr. 256).



32

Kemp has not prepared a resume or looked for work since she stopped working at Metro-North in June 2004, and her doctor advised her not to work. She testified that she is still dysfunctional.

On August 18, 2004, Dr. Zisu signed a Statement of Sickness form of the U.S. Railroad Retirement Board ("RRB") attached to Kemp's RRS application for sickness benefits claiming benefits since July 21, 2004, stating that Kemp would be able to resume work in six months to one year.

On November 18, 2004, Dr. Zisu signed an Attending Physician's Statement in connection with Kemp's application to Prudential Financial for Long Term Disability ("LTD") insurance benefits, which stated, in part, that Ms. Kemp was "not presently expected to return to work."

On December 30, 2004, Dr. Zisu signed a RRB Statement, which stated that Kemp was not able to work and estimated her return to work date as June 1, 2005.

On February 23, 2005, Dr. Zisu signed a RRB Statement, which stated that Kemp was not able to work and estimated her return to work date as July 1, 2005. On June 13, 2005, Dr. Zisu

33

signed a RRB Statement estimating Kemp would be able to resume work
in six months to one year.  He signed RRB Statements on October 8,
2005, January 23, 2006, and September 1, 2006 stating that she was
unable to work and that her estimated return to work was
"indefinite".

Kemp hired an attorney to pursue her LTD claim who sent
Kemp to Dr. Richard Podell ("Dr. Podell").  Dr. Podell on July 15,
2005, wrote that Kemp "was disabled" with Chronic Fatigue Syndrome
("CFS") together with Fibromyalgia as of the time she stopped
working at Metro-North, that "this disability is likely to be
permanent," and that she "is unable to work on a sustained basis at
any job full or part time."  (Witkin Aff., Ex. S).

Kemp was not diagnosed with CFS while employed by Metro-
North and never told Metro-North that she had CFS or Fibromyalgia.
Kemp testified that Dr. Podell advised her, as had Dr. Zisu, that
she was not capable of working.

**Summary Judgment Standard**

In deciding a motion for summary judgment, a court shall
render judgment "forthwith if the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the

34

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The moving party has the initial burden of showing that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, Celotex, 477 U.S. at 325. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1187 (2d Cir. 1987); see also Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d Cir. 1985). However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc.,

35

477 U.S. 242, 249 (1986).   If there is not, summary judgment is proper.  See id. at 249-50.

        "The salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation."  Nicastro v. Runyon, 60 F. Supp. 2d 181, 183 (S.D.N.Y. 1999) (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).   Greater caution must be exercised, however, in granting summary judgment in employment discrimination cases where the employer's intent is genuinely in issue.   Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999).  This is so because "employers are rarely so cooperative as to include a notation in the personnel file that the [action complained of] is for a reason expressly forbidden by law."  Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation marks and citation omitted; brackets in original).   But even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997); see also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

**Defendant is Not Immune from the NYCHRL**

Section 1266(8) of the New York State Public Authorities
Law, referring to Metro-North's parent, the MTA, provides that:

> no municipality or political subdivision . . .
> shall have jurisdiction over any facilities of
> the authority or any of its activities or
> operations.   The local laws, resolutions,
> ordinances, rules and regulations of a
> municipality or political subdivision . . .
> conflicting with this title or any rule or
> regulation of the authority, shall not be
> applicable to the activities or operation of
> the authority.

Section 1266(5) of that statute gives MTA subsidiaries,
including Metro-North, the same privileges and immunities as the
MTA.  Metro-North has argued that this law renders it immune from
the anti-discrimination provisions contained in the NYCHRL.  See
Robinson v. Metro-North Commuter R.R., 1998 U.S. Dist. LEXIS 373,
at *33 (S.D.N.Y. Jan. 15, 1998).   However, courts that have
considered the issue in a more nuanced fashion have rejected Metro-
North's position.  See Levy v. City Comm'n on Human Rights, 85
N.Y.2d 740, 746 (1995); Everson v. New York City Transit Auth., 216
F. Supp. 2d 71, 80-81 (E.D.N.Y. 2002); Wahlstrom v. Metro-North
Commuter R.R., 89 F. Supp. 2d 506, 527 n. 21 (S.D.N.Y. 2000).
Metro-North is not immune from the reach of the NYCHRL insofar as
the law is not inconsistent with any New York State law.  See Levy,

37

85 N.Y.2d at 746.  Here, Defendant has not identified any way in which the NYCHRL conflicts with state law.  Accordingly, Metro-North is not exempted from the requirements of the NYCHRL.

**Harassment Resulting from Disability Has Not Been Established**

To survive a motion for summary judgment, a plaintiff alleging harassment due to disability under the NYSHRL and NYCHRL, a plaintiff must adduce sufficient evidence of the following elements: (1) she is disabled within the definition of the NYSHRL and/or NYCHRL; (2) she suffered unwelcome harassment; (3) she was harassed because of her disability; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.  See Ruhling v. Tribune Co., 2007 U.S. Dist. LEXIS 116 (S.D.N.Y. Jan. 3, 2007); see also Weinstock, 224 F.3d at 42 n.1 (noting that "identical standards apply to employment discrimination claims brought under Title VII, Title IX, [the NYSHRL, and the NYCHRL]").[2]

---

[2] While the parties have agreed that the NYSHRL prohibits only harassment that is "severe and pervasive," Plaintiff has argued that under the NYCHRL, "liability should be determined by the existence of unequal treatment and questions of severity and frequency reserved for consideration of damages." Farrugia v. N. Shore Univ. Hosp., 820 N.Y.S.2d 718, 725 (N.Y. Sup. 2006).  As discussed below, Defendant is entitled to summary judgment on the harassment claims even under the relaxed Farrugia standard. Accordingly, the Court need not resolve the issue.

38

Kemp has asserted that the evidence of harassment consisted of Bernard's unhappiness with her working part time; his failure to help her with a payroll problem; his anger related to a retirement party; his appointment of Barnett to supervise her; Barnett's denial of her vacation and criticism of her performance.

Kemp testified that when she told Bernard she would not work the same three days each week, he "made a face" she interpreted as "not happy" or "kind of disgusted" but what he said was that he preferred she come in the same three days. (Kemp Tr. 118-20). Kemp testified that the "animosity" she claimed to feel was not based on the "face" she said Bernard made in any event. (Kemp Tr. 121).

Kemp testified she returned to work full time because part-time employees do not get paid for holidays, not because of Bernard's alleged "animosity," and that Bernard never flippantly referred to "this cancer of yours" or said that her absences were "ridiculous." (Kemp Tr. 129, 251).

Bernard asked Joshua to look into her payroll problem and then told Kemp that she would get paid.

Kemp has asserted that Bernard "expressed anger" about

39

a retirement party planned, but did not note that without Bernard's permission, she had guaranteed a paid headcount to the restaurant which Bernard subsequently had to withdraw.   (Kemp Tr. 154-58).

Kemp failed to identify any facts to establish that Bernard appointed Barnett to supervise Kemp to harass her because of breast cancer.   Bernard's promotion of Barnett further weakens the claim that Bernard discriminated against Kemp because of her illness, as Bernard promoted Barnett in 1999 after Barnett's 1997 breast cancer surgery and medical leave.   Barnett testified that Bernard was generous to her and others who were ill.   Kemp did not allege disability animus by Bernard in either her February 2003 internal complaint or her February 2004 EEOC Charge.

Kemp has presented no evidence that Barnett's February 2003 conduct concerning her vacation, job performance and job description was based on Kemp's 2002 breast cancer.   Kemp's allegation of Barnett's discriminatory motive is especially problematic, given Barnett's status as a breast cancer survivor herself.   See Fosen v. New York Times, 2006 U.S. Dist. LEXIS 75662, at *14-*15 (S.D.N.Y. Oct. 11, 2006) (finding discrimination unlikely where decision-maker was in same protected class as plaintiff); Zeigler v. Marriott Int'l, Inc., 2005 U.S. Dist. LEXIS 7647, at *42 (S.D.N.Y. May 4, 2005) (citing Sykes v. Mt. Sinai Med.

Ctr., 967 F.Supp. 791, 797 (S.D.N.Y. 1997)); <u>Banks v. Metro-North</u>
<u>Commuter R.R.</u>, 2000 U.S. Dist. LEXIS 508, at *23-*24 (S.D.N.Y. Jan.
14, 2000), <u>aff'd</u>, 234 F.3d 1261 (2d Cir. 2000).

Kemp has admitted that her vacation was not denied, but
merely conditioned on showing the tickets she had bought without
pre-clearing the vacation.  Kemp cancelled her vacation in February
after breaking her toe and getting her ticket money refunded and
took the vacation in May instead with Barnett's approval.

The criticism of Kemp by Barnett was expressed in
relatively a few emails and memos, and no facts have been presented
to suggest that the criticisms were based on anything other than
Barnett's view of Kemp's job performance.

Barnett's attempt to change Kemp's job description was
not new, as she concedes that Barnett had tried to revise the job
description "for some time."  (Pl. Mem. in Opp., at 12).   The
change was not material because Bernard did not approve the change,
and Kemp never saw the new job description before she filed her
complaint.

Kemp has failed to establish harassment based upon her
disability.  The alleged conduct was not based on her 2002 breast

41

cancer.  It was not severe or pervasive, nor a denial of equal
treatment.  Barnett viewed Kemp to be unproductive, insubordinate
and in need of more supervision.  These are legitimate, non-
discriminatory reasons for her conduct, and Kemp has presented no
evidence they were pretextual.  Kemp's speculations about the
motives of Bernard and Barnett are not sufficient to defeat a
motion for summary judgment.  See McPherson v. New York City Dep't
of Ed., 457 F.3d 211, 215 n.4 (2d Cir. 2006).

        The claim of disability-based harassment has not been
established under either the NYSHRL or NYCHRL.

## The Retaliation Claims Have Not Been Established

        "Under both the [NYSHRL and NYCHRL], it is unlawful to
retaliate against an employee for opposing discriminatory
practices."  Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295,
312-13 (2004).

        To establish a prima facie case of retaliation under the
ADA, NYSHRL, NYCHRL, a plaintiff must establish that (1) she was
engaged in an activity protected by the ADA, NYSHRL, and/or NYCHRL,
(2) the employer was aware of that activity, (3) an employment
action adverse to the plaintiff occurred, and (4) there existed a

42

causal connection between the protected activity and the adverse
employment action.  <u>See</u> <u>Sarno v. Douglas Elliman-Gibbons & Ives,
Inc.</u>, 183 F.3d 155, 159 (2d Cir. 1999); <u>Cooney v. Consolidated
Edison</u>, 220 F. Supp. 2d 241, 248 (S.D.N.Y. 2002), <u>aff'd</u>, 63 Fed.
Appx. 579 (2d Cir. May 13, 2003); <u>Forrest</u>, 3 N.Y.3d at 312-313
(applying the same standard for NYSHRL and NYCHRL retaliation
claims).


        When evaluating claims of retaliation under the ADA,
NYSHRL, and NYCHRL, courts use the well-known <u>McDonnell Douglas</u>
burden-shifting framework.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>,
411 U.S. 792, 793 (1973); <u>Slattery v. Swiss Reinsurance Am. Corp.</u>,
248 F.3d 87, 95 (2d Cir. 2001); <u>Cooney</u>, 220 F. Supp. 2d at 248.
First, the plaintiff must prove by a preponderance of the evidence
a prima facie case of retaliation.  <u>Texas Dep't of Cmty. Affairs v.
Burdine</u>, 450 U.S. 248, 252-53 (1981); <u>McDonnell Douglas</u>, 411 U.S.
at 802-04; <u>Terry v. Ashcroft</u>, 336 F.3d 128, 138 (2d Cir. 2003);
<u>Weinstock</u>, 224 F.3d at 42.  Only if the plaintiff meets this
initial burden will the burden then shift to the defendant to
produce evidence that the adverse employment action was taken for
some legitimate, non-discriminatory reason.  <u>See</u> <u>Burdine</u>, 450 U.S.
at 254-55.   If  the  defendant  articulates  a  legitimate
non-discriminatory reason for its action, "the presumption raised
by the prima facie case is rebutted, and drops from the case." <u>St.</u>

43

Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting
Burdine, 450 U.S. at 255 n.10).   Then, the plaintiff has the
ultimate burden to demonstrate by a preponderance of the evidence
that the articulated reason offered by the defendant for the
adverse employment action is merely a pretext for actual
discrimination.   Mandell v. County of Suffolk, 316 F.3d 368, 380-81
(2d Cir. 2003).

Kemp has maintained that her June 2004 transfer to
Operations was retaliation for her (1) February 2003 internal
complaint and (2) February 2004 EEOC Charge.   However, Kemp has
failed to show by a preponderance of the evidence that the transfer
was causally connected with either of the above actions.

Defendant asserts that Kemp's internal complaint did not
constitute protected conduct, citing Clark County Sch. Dist. v.
Breeden, 532 U.S. 268 (2001).   However, there exists a genuine
dispute of fact over whether Kemp had a good-faith belief that a
violation existed.   See Sumner v. U.S. Postal Serv., 899 F.2d 203,
209 (2d Cir. 1990).   There is no dispute that Defendant was aware
of both the 2003 internal complaint and the 2004 EEOC Charge.

For an employment action to qualify as retaliation, it
must be "materially adverse, which in this context means it well

44

might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006) (citation and quotation marks omitted). "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. at 2417 (citation and quotation marks omitted).

Kemp claims that her June 2004 transfer was materially adverse because the new job was "clerical" and thus a "demotion" and that the people who transferred her knew she did not want the job.

Kemp testified that her duties in the Legal Department in 2004 included: most importantly, indexing documents and files and "different databases like registered contracts" (Kemp Tr. 77-79, 86-87, 184, 578-79, 586) and maintaining a database for the FELA group (Kemp Tr. 578, 582-85); being "in charge of the library" which "diminished as the computerized records appeared" and as computerized legal research databases replaced books (Kemp Tr. 80-81, 184); administratively "supervising" three secretaries (Kemp Tr. 77, 80); being "the computer guy" (Kemp Tr. 77-78, 184); (preparing the department's budget, internal controls review,

45

letters to outside auditors, monthly reports to MTA on outside counsel expense and quarterly reports on ongoing litigation (Kemp Tr. 77, 578-82); and doing "legal research" (Kemp Tr. 184-86, 583-84).

Kemp has acknowledged that the Operations position paid the same as her job in Legal and that the job was supposed to report to Herrington. The duties of the Operations job remain in dispute, however, largely because Kemp held the position for only a few days.

Kemp's contention that she refused the Operations job are also matters of factual dispute and contradicted in this record.

Viewed in the light most favorable to Kemp, there is a triable issue as to whether the transfer to Operations "could well have dissuaded a reasonable employee in [Kemp's] position from complaining of unlawful discrimination." <u>Kessler v. Westchester County Dep't of Soc. Servs.</u>, 461 F.3d 199, 209 (2d Cir. 2006).

Kemp's retaliation claim fails because she cannot establish a causal connection between the alleged protected conduct and the transfer. She cannot claim the transfer was retaliation for her Charge, because the transfer was determined and being

46

implemented before she filed the Charge.  See Breeden, 532 U.S. at
272 ("Employers need not suspend previously planned transfers upon
discovering that a Title VII suit has been filed, and their
proceeding along lines previously contemplated, though not yet
definitively determined, is no evidence whatever of causality.").
The transfer decision (communicated to her October 3, 2003) was
made before she filed the EEOC Charge, even though the actual
transfer occurred after the Charge.

        In addition, Kemp has not established a causal connection
between her transfer and the internal complaint.  First, the
transfer occurred more than fifteen months after the complaint.
While "there is no bright line distinction for how close in time an
adverse action must be to the protected activity" in order to
establish an inference of causation, Uddin v. City of N.Y., 427 F.
Supp. 2d 414, 433 (S.D.N.Y. 2006), courts have routinely found much
shorter gaps of time insufficient to show causation.  See Shah v.
Consol. Edison Corp., 2005 U.S. Dist. LEXIS 4012, at *8 (S.D.N.Y.
Mar 14, 2005) (gap of six months "far too long"); Ponticelli v.
Zurich Am. Ins. Group, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998)
(two-and-a-half month gap "hardly the close proximity of time"
necessary); see also Hollander v. Am. Cyanamid Co., 895 F.2d 80,
85-86 (2d Cir. 1990) (finding no causation when adverse employment
action occurred three months after protected activity); Milford v.

47

New York City Bd. of Health, 2005 U.S. Dist. LEXIS 1131, at *26 (S.D.N.Y. Jan. 27, 2005) (same, after nine month gap); Taylor v. Potter, 2004 U.S. Dist. LEXIS 15992, at *70-*71 (S.D.N.Y. Aug 16, 2004) (same, after eight month gap); Dodson v. CBS Broad. Inc., 2004 U.S. Dist. LEXIS 10787, at *76 n. 27 (S.D.N.Y. June 15, 2004) (same, after eight month gap); Knight v. City of New York, 303 F. Supp. 2d 485, 497 (S.D.N.Y. 2004) (same, after fifteen month gap). The temporal link between Kemp's February 21, 2003 internal complaint and transfer to a new job starting on June 1, 2004 is too attenuated to constitute evidence of a causal nexus.

That the investigation of Kemp's internal complaint did not begin until 90 days after she filed it is not evidence of a causal connection. Metro-North engaged outside counsel to do the investigation, as it involved a member of the Legal Department. Once engaged, outside counsel swiftly investigated and wrote a report (in fewer than three weeks) signed by a member of the firm. Turner and Gormley-O'Connor, of the Workforce Diversity Department, working with Herrington, arranged and implemented the transfer. No evidence has been adduced to suggest that those who arranged for the transfer had a motive to retaliate. See Dullard v. City of N.Y., 274 F. Supp. 2d 347, 363 (S.D.N.Y. 2003) (granting summary judgment against retaliation claim where plaintiff "failed to link the decision to transfer him . . . with any decision maker who

48

might have had a retaliatory motive"); <u>Taylor v. Lenox Hill Hosp.</u>, 2003 U.S. Dist. LEXIS 5429, at *28-*29 (S.D.N.Y. April 3, 2003) (granting summary judgment against retaliation claim where plaintiff presented no evidence tending to show that decision-makers intended to retaliate against him); <u>Cooney</u>, 220 F. Supp. 2d at 251.

Having received a report finding no discrimination and recommending Kemp's transfer to resolve a personality conflict with Barnett, Turner's only demonstrated interest was for the transfer to succeed. Neither Barnett nor Bernard participated in the decision-making.

Kemp has failed to present adequate evidence of a causal link between her internal complaint and her transfer to the Operations job.

Metro-North has also presented legitimate, non-discriminatory reasons to transfer Kemp: her personality conflict with Barnett and dissatisfaction with her work environment.

Kemp testified that she could not stand being in the "hostile" atmosphere of the Department, even after Barnett no longer supervised her. On December 3, 2003, Kemp wrote that she

49

could not function at work.  On January 17, 2004, six weeks into a leave of absence that lasted eight weeks, she expressed apprehension about returning to work in the Legal Department.  She said it was so bad that she had to take a two-month leave of absence in December 2003 and January 2004.  Kemp stated it was "unbearable" for her to remain the Legal Department, and that neither she nor her doctor saw returning to the Department as a viable option.

The SS report's recommendation that Kemp be transferred supports one of Metro-North's legitimate non-discriminatory reasons for the transfer: resolving Kemp's conflict with Barnett.  The SS report found -- and Kemp has admitted -- an irreparable personality conflict between Kemp and Barnett.  See Diaz v. TMC Servs., 451 F. Supp. 2d 566, 575-76 (S.D.N.Y. 2006) (finding adverse employment action based on personality conflict not discriminatory).

"Criticisms that precede the protected activity are relevant to a finding that there was no causal nexus." Ponniah Das v. Our Lady of Mercy Med. Ctr., 2002 U.S. Dist LEXIS 7771, at *36 (S.D.N.Y. Apr. 30, 2002), aff'd, 56 Fed. Appx. 12 (2d Cir. Jan. 23, 2003) (citations omitted).  Kemp's conflict with Barnett -- dating back to before 2002 -- preceded the filing of her internal complaint by more than a year.  Barnett, and others, repeatedly

50

complained about Kemp's work habits in the months and years prior
to the internal complaint.

To rebut Metro-North's non-discriminatory explanation,
Kemp "must produce not simply 'some' evidence, but 'sufficient
evidence to support a rational finding that the legitimate,
non-discriminatory reasons proffered by the [defendant] were false,
and that more likely than not [discrimination] was the real reason
for the [employment action].'" <u>Weinstock</u>, 224 F.3d at 42 (quoting
<u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 714 (2d Cir.
1996)) (brackets in original).

Kemp has failed to adduce any evidence that Metro-North's
stated reasons for the transfer were pretextual.  The fact that
Barnett no longer directly supervised Kemp at the time of the
transfer casts scant suspicion on Metro-North's justification for
the transfer.  In fact, the removal of Barnett as Kemp's direct
supervisor actually supports Metro-North's explanation; it was a
remedial action specifically recommended by the SS report as a way
of easing Kemp's personality conflict with Barnett.  <u>See</u> <u>Avillan v.
Potter</u>, 2006 U.S. Dist. LEXIS 80062, at *63-*64 (S.D.N.Y. Nov. 1,
2006) ("[W]here, as here, the nonretaliatory justification is
supported by an employer's conclusions following an investigation,
a plaintiff cannot escape summary judgment by simply attacking the

legitimacy of the employer's findings."); see also McPherson, 457 F.3d at 215-16 (investigatory conclusions -- that plaintiff improperly used corporal punishment -- were legitimate non-discriminatory reasons for terminating her employment); Simpson v. Metro-North Commuter R.R., 2006 U.S. Dist. LEXIS 50331, at *40-*42 (S.D.N.Y. Jul. 21, 2006).

"To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." Weinstock, 224 F.3d at 42 (citation and quotation marks omitted).  Because Kemp has not established that the reasons for transferring her were pretexts for retaliating against her, her claims should be dismissed.

## Conclusion

As set forth above, Defendant's motion for summary judgment is granted.  The Clerk of the Court is ordered to enter judgment in favor of Defendant and close this case.

It is so ordered.

New York, NY

June 12 2007

Robert W. Sweet, U.S.D.J.

52